## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DETRICK LEWIS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  2:18-cv-00428-RDP** |
| } | |
| **UNITED STATES STEEL** } | |
| **CORPORATION,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant United States Steel Corp.'s ("Defendant")

Motion for Summary Judgment. (Doc. # 22). The Motion has been fully briefed (*see* Docs. # 23,

26, 28) and is ripe for review. After careful review, because of the muddied nature of the Rule 56

record and for the reasons discussed below, Defendant's Motion (*see* Doc. # 22) is due to be

denied.

Plaintiff claims that Defendant intentionally discriminated against him based on his race

(African-American) in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42

U.S.C. § 1981.[1] (Doc. # 1). In particular, Plaintiff contends that Defendant terminated his

employment because of his race and/or that race was a motivating factor that prompted

Defendant to discharge him. In support, Plaintiff asserts that Defendant treated a similarly-

situated Caucasian employee, Ray Stanford, more favorably than him, notwithstanding the fact

---

[1] Title VII racial disparate treatment claims and § 1981 race discrimination claims are evaluated using the same analytical framework. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

that they were disciplined for violating the same two Cardinal Safety Rules (which are addressed in more detail below). Defendant argues that Plaintiff's claim necessarily fails because Plaintiff cannot make out a *prima facie* case of race discrimination, and, alternatively, there is no showing of pretext on the part of Defendant. (Doc. # 23 at 14-15).

## I. Factual Background[2]

The court first addresses Plaintiff's employment history with Defendant, the incident at issue that led to his discharge, and his ultimate discharge. The court then turns to Plaintiff's claim of race discrimination, assessing relevant information about Ray Stanford—Plaintiff's proposed comparator.

### A. Plaintiff's Employment History

Plaintiff is an African-American male who worked for United States Steel Corp. ("Defendant") at the Fairfield Works pipe mill from August 20, 2000 to October 20, 2015.[3] While employed, Plaintiff was a member of the United Steelworkers Union ("Union"). (*Id.* at 26). Plaintiff's Union contract, known as the Basic Labor Agreement ("BLA"), contained a grievance and arbitration process, as well as information regarding a Civil Rights Committee that allowed members to file a civil rights complaint if they believed they were discriminated against. (*Id.* at 27-28, 70, 71; Doc # 24-2 at ¶ 8).

Plaintiff began his employment with Defendant in an entry level position -- what Plaintiff

---

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] This date is disputed. As discussed below, Plaintiff received a letter of termination on October 20, 2015. (Doc. # 24-2 at 105). However, Plaintiff stated that he sent in a resignation letter on October 26, 2015 so he could recover the money from his 401(k) plan. (*Id.* at 57; Doc. # 24-5 at 23-24, 34). The resignation letter indicated that Plaintiff's last physical working day was August 29, 2015. (Doc. # 24-2 at 57). However, in Defendant's response to the EEOC Charge, it stated that Plaintiff's resignation took effect on September 1, 2015. (Doc. # 27-1 at 1).

terms a general laborer -- which was designated as a "box one" position. (Doc. # 24-5 at 67-68).

A short time thereafter, Plaintiff was promoted to a "box two" position, which came with more responsibilities and job duties, such as materials handling and crane operations. (*Id.* at 68). Plaintiff first began working as a crane operator in 2001. (*Id.* at 92-93). In that position, Plaintiff worked structured shifts. For example, there was the A turn (or "shift"), where an employee worked from 11:00 p.m. to 7:00 a.m.; the B turn, from 7:00 a.m. to 3:00 p.m.; and the C turn, from 3:00 p.m. to 11:00 p.m. (Doc. # 24-1 at 26). Generally, an employee would not work the same shift week to week, and each shift had its own shift manager. (*Id.* at 28).

Additionally, Plaintiff was required to attend safety training and receive tailored instruction. In 2001, when Plaintiff first began working as a crane operator, there was a system in place where union workers would train employees on crane operations before starting a job. (*Id.* at 83). However, when Plaintiff began operating a crane again in 2015[4] (*see id.* at 93), he testified that he did not receive any training in such a manner, in part because Defendant had eliminated that system. (*Id.* at 83-84, 155-56). Plaintiff was also scheduled to attend a mandatory crane Refresher Class on August 27, 2015, but he did not show up. (Doc. # 24-1 at 211-12).

Indeed, Plaintiff does not recall attending any overhead crane safety training in 2015 even though they were required.[5] (*Id.* at 97-98). He also testified that he was unaware of the then-applicable proper procedures for boarding and debearding a crane because he had not been trained on those procedures since 2001, and the procedures in 2001 were different from those in

---

[4] Plaintiff was re-certified to be a crane operator by Defendant on August 21, 2015. (Doc. # 24-5 at 85). However, Plaintiff was not "approved" as a finishing crane operator until August 28, 2015—the day before the August 29, 2019 incident. (Doc. # 24-1 at 210-11).

[5] There appears to be some disputed evidence about this issue in the record. An email to Moses dated August 31, 2015 indicates that Plaintiff began crane operations training during the week of August 16, 2015. (Doc. # 24-2 at 20; *see also* Doc. # 24-1 at 149). The email also documented that Plaintiff attended "safety blitz" training sometime in 2015. (Doc. # 24-2 at 26). Additionally, Moses testified that Plaintiff was training the week of August 23, 2015 with either Letisa Parker, Keith Higgins, or Junior Land. (Doc. # 24-1 at 219). However, the Rule 56 record is muddy as to whether Plaintiff did in fact attend any of the required crane refresher courses.

2015. (*Id.* at 157). Defendant, however, contends that Plaintiff was "contacted" regarding crane safety training, energy control training, and Cardinal Safety Rules from January to March 2015. (Doc. # 27-1 at 3).

As an employee, Plaintiff was required to abide by certain rules, policies, and procedures. There were specific rules, namely Cardinal Rules, that, if violated, could result in discharge. (Doc. # 24-5 at 71). Some of the Cardinal Rules include (1) wearing fall protection when boarding a crane, (2) following energy control lock-out/tag-out/tryout including hazardous energy control procedures, and (3) adhering to the procedures for boarding and deboarding cranes. (*Id.* at 75, 80, 81).

With respect to these rules, the Rule 56 record demonstrates that throughout Plaintiff's employment, he had received approximately five written warnings for the violation of safety or other work rules: (1) on December 15, 2000, Plaintiff received a written warning for failing to wear gloves while handling materials; (2) on July 25, 2010, Plaintiff received a written warning for leaving work 1.25 hours early without notifying his shift manager; (3) on March 4, 2013, Plaintiff received a 5-day suspension subject to discharge for failing to report an incident; (4) on December 18, 2014, Plaintiff received a written warning for damage to company property; and (5) on December 18, 2014, Plaintiff received a written warning for unsatisfactory work. (Doc. # 24-6 at 12-17). However, only one of these violations (the March 4, 2013 warning for failure to report an incident) resulted in a five-day suspension subject to discharge. (*Id.* at 14).

### B. The August 29, 2015 Crane Incident

On August 29, 2015, Plaintiff was working the B shift, which ended at 3:00 p.m. (Doc. # 24-5 at 104). During this shift, Plaintiff's shift manager was Jared Gibson, a Caucasian male. (Docs. # 24-1 at 27; 24-5 at 105). Plaintiff was operating Crane 109 when it suddenly broke

down. (Doc, # 24-5 at 105). Plaintiff testified that he called Gibson to inform him that the crane had broken down, and Gibson said he would send maintenance to fix it. (*Id.*). Plaintiff does not recall Gibson telling him to stay with the crane until maintenance arrived.[6] Plaintiff waited from 2:30 p.m. to 3:00 p.m. for maintenance, but no one came. (*Id.* at 106). When Plaintiff's shift ended at 3:00 p.m., he deboarded the crane -- without notifying Gibson -- and left. (*Id.* at 106-07). Plaintiff testified that this was the protocol he remembered from when he first received his crane operation training in 2001. (*Id.* at 82, 92). However, as the Rule 56 record reflects, this was not the protocol in place when Plaintiff deboarded the crane on August 29, 2015. Shea Moses, a Caucasian male who is employed as the area manager, testified that the protocol requires the operator to stay in the crane and wait for another crane to push the broken crane to the bumper so the operator could safely exit. (Doc. # 24-1 at 67). However, because Plaintiff did not attend all of the required safety trainings, he claims he was unaware of this change in protocol. (Doc. # 24-5 at 97-98).

As Plaintiff was leaving his shift, he passed Ray Stanford -- the employee who was taking over the next shift -- and informed him that the crane had malfunctioned, and that maintenance had not yet been up to fix it. (*Id.* at 107). Approximately two hours after Plaintiff left work, he received a call from Gibson who told him that he was not supposed to leave the crane. (*Id.* at 109). Then, an hour after that phone call, Plaintiff received another call telling him to come back to the facility. (*Id.*). Plaintiff complied and met his Union representative, Martin

---

[6] This is relevant because Defendant relies on the allegation (in support of its decision to terminate Plaintiff) that Gibson told Plaintiff to stay in the crane to wait for maintenance. (Doc. # 24-7 at 68). Specifically, William Dittrich testified that according to his recollection from what Moses told him, he believed Gibson told Plaintiff to stay with the crane. (*Id.*). However, Plaintiff disputes this allegation, and it is not found in the Rule 56 record apart from the deposition testimony of Dittrich (who heard it from Moses), James Patrick Thomas (who was not involved with Plaintiff's discipline or discharge and who testified that he only heard it from Moses), and Moses. (*Id.* at 69-70; Doc. # 24-9 at 22; Doc. # 24-1 at 257). Therefore, the Rule 56 record indicates that this assertion -- that Plaintiff was told to stay with the crane -- is in dispute and is hotly contested.

Edwards, at the facility. (*Id.* at 110). Plaintiff was approached by Chip Meyers (another Caucasian male who was employed as a shift manager), Moses, and others. (*Id.* at 111). Plaintiff told Meyers and Moses of the events that had taken place, and he also told them that he "didn't know about the harness or lock-out," and he just followed protocol from "previous practice." (*Id.* at 114).

Plaintiff testified that he went back to work two days later and resumed crane operations. (*Id.* at 120). However, Plaintiff was involved in another incident with a crane. (*Id.*; Doc. # 24-2 at 76). Plaintiff lost control of the crane he was operating, and it swung and hit a rail. (Doc. # 24-2 at 76). After this second incident, Plaintiff was brought to his supervisor's office, stayed there for three hours, was told to "clock out" (meaning his badge would be deactivated), and that they would let him know what would happen. (*Id.* at 120-21; Doc. # 24-7 at 31).

Subsequently, on September 15, 2015, Defendant held a 9B fact-finding hearing[7] regarding the August 29, 2015 incident. (Doc. # 24-1 at 96-97, 189; Doc. # 27-1 at 2). This was the only time Defendant interviewed Plaintiff regarding the incident. (Doc. # 24-1, Moses Dep., at 165). As a result of the 9B hearing, six employees were disciplined. Four members of management -- Shea Moses, the area manager, Bill Dittrich, a labor relations supervisor, Steven Bauer, a manager of employee relations, and Pat Mullarkey, the plant manager for Fairfield Works (with input from others) -- determined the severity of discipline that each employee received (*see* Doc. # 24-2 at 100):

1. Jared Gibson, a Caucasian male who was employed as a shift manager, received a

---

[7] A 9B hearing is part of the grievance process under the administration of the BLA. (Doc. # 24-7 at 19-20). A 9B hearing allows an employee to object to discipline. (Doc. # 27-1 at 2). "At a 9B hearing the company reviews the facts with the employee present and their union present, [and] goes over those facts. [The employee] has the opportunity to be heard in response to the discipline that was issued, and the company will make a decision whether or not to affirm that discipline, remove the discipline[,] or modify the discipline into something else or convert the discipline to discharge." (Doc. # 24-7 at 20).

five-day suspension subject to discharge for violating numerous Cardinal Safety Rules, both in relation to the August 29, 2015 incident and another incident. (Doc. # 24-8 at 15). Gibson was discharged on September 10, 2015. (*Id.*).

2. Chip Meyers, a Caucasian male who was employed as a shift manager, received a five-day suspension subject to discharge for directing an employee to "go up to the crane that wasn't locked out" without fall protection. Meyers was subsequently discharged. (Doc. # 24-1 at 162).

3. Sam Kamau, an African-American male who was employed as a crane operator, received a five-day suspension not subject to discharge for unsafe operation of a crane. (Doc. # 24-1 at 73-74, 184). Kamau was not discharged.

4. Ed McLendon, an African-American male who was employed as the maintenance engineer, received a five-day suspension not subject to discharge for failing to lock out the crane rail.[8] (Doc. # 24-1 at 184-85). McLendon was not discharged.

5. Ray Stanford, a Caucasian male who was employed as a crane operator, received two five-day suspensions subject to discharge for violation of Cardinal Rules, failing to wear fall protection and failing to lock-out/tag-out the crane. (Doc. # 24-1 at 182). Stanford was not discharged.

6. Plaintiff, an African-American male who was employed as a crane operator, received two five-day suspensions subject to discharge for violation of Cardinal Rules, failing to wear fall protection and failing to lock-out/tag-out the crane. (Doc. # 24-7 at 48-49). Plaintiff was subsequently discharged.

---

[8] Moses testified that McLendon received a five-day suspension not subject to discharge for failing to lock out the crane rail. (Doc. # 24-1 at 184-85). However, Dittrich testified that McLendon was disciplined for failing to wear fall protection. (Doc. # 24-7 at 82-83). This inconsistency, and lack of clarifying factual evidence in the Rule 56 record, is but one example of the muddiness within the Rule 56 record as a whole.

## C.  Plaintiff's Discharge

Based on the facts uncovered at the 9B hearing, Plaintiff was formally terminated[9] from employment on October 20, 2015.[10] (Doc. # 24-5 at 151). Defendant determined he violated two Cardinal Rules: (1) failure to wear fall protection, and (2) failure to lock-out/tag-out the crane. (Doc. # 24-7 at 48-49). Dittrich was the "representative [who] issued the discipline against [Plaintiff] and then performed the initial investigation at the 9B hearing." (*Id.* at 19). Dittrich testified that Steven Bauer discussed with him the discipline that should be issued. (*Id.* at 22-23). Both Dittrich and Bauer serve in the Labor Relations Department. (Doc. # 24-1 at 162-63). Bauer made the final decision to issue the discipline to Plaintiff, and Dittrich implemented the discharge the day following the 9B hearing. (*Id.* at 23). Dittrich testified that, in making the decision to initially suspend Plaintiff, he relied on the information he received during his discussions with Gibson and Moses and his recollection that Gibson told Plaintiff to stay in the crane and wait for maintenance. (*Id.* at 22; Doc. # 24-3 at 136). Dittrich also relied on the initial first report (the "root cause report") from the safety department. (*Id.* at 22; Doc. # 24-3 at 136).

Dittrich testified that, with respect to Plaintiff and Stanford, he had to decide whether to affirm, revoke, extend, modify, or convert each discipline into a discharge. (Doc. # 24-7 at 45-46). He stated that the decision depended heavily on the facts of the case and whether "he ha[d] the evidence to be able to have the discipline affirmed . . . all the way through arbitration." (*Id.* at 46). Under the Union agreement, an employee cannot be discharged immediately. (*Id.* at 20). Rather, there is a process that must be followed when an employee is terminated. (*Id.*). And, in

---

[9] This date is also unclear based upon the Rule 56 record. In Moses' deposition testimony, he concedes that the October 20, 2015 could be a typo, and that it should likely read September 20, 2015. (Doc. # 24-1 at 189-91).

[10] Plaintiff subsequently filed his EEOC Charge on December 3, 2015, "alleg[ing] that [Defendant] engaged in unlawful employment practices in violation of Title VII[] by discharging him while allowing his white co-worker [Ray Stanford] to keep his job when they both violated [the same] Cardinal Safety Rules." (Doc. # 24-3 at 131; Doc. # 27-2 at 1).

determining whether it would be appropriate to convert a suspension subject to discharge to an actual discharge, Dittrich testified that a lot depends on "the corporate policies with regard to [the] discipline, [and] the arbitral precedent with the regard to [the discipline]." (*Id.* at 47). Dittrich testified that a violation of a Cardinal Rule, which is a dischargeable violation, could be cause for discharge if "there were no evidentiary problems and [the employee] did violate the rule." (*Id.*). In this instance, because he stated he found no evidentiary problems with Plaintiff's case, and, at least in Defendant's eyes,[11] Plaintiff admitted wrongdoing, Dittrich converted Plaintiff's suspension to discharge. (*Id.* at 49).

The record evidence presents a question about whether Plaintiff was terminated from employment or resigned. Plaintiff testified that he received his discipline and then received notice that his discipline had been converted to discharge after the 9B hearing. (Doc. # 24-5 at 22-23). There is documentation contained in an excel spreadsheet that Plaintiff was "terminated" in 2015, rather than resigned. (Doc. # 24-2 at 40). Subsequently, Plaintiff spoke with his Union representatives, who then talked to Dittrich to confirm Plaintiff's discharge. (Doc. # 24-5 at 22-23). After speaking with his Union representatives, Plaintiff sent in a letter of resignation on October 26, 2015, notifying Defendant that his last "physical working day" was August 29, 2015, and did so because that would permit him to receive a distribution from his 401(k). (*Id.* at 33; Doc. # 27-1 at 1; Doc. # 24-2 at 57). If Plaintiff had not "resigned," he would not have been able to do so.

Plaintiff did not file any further grievance or request arbitration because he believed,

---

[11] Plaintiff explicitly stated that he did not admit to any wrongdoing during the 9B hearing. (Doc. # 24-3 at 136).

based upon his communications with the Union,[12] that he had already gone through the entire appeal process and his discharge was final. (Doc. # 24-5 at 24, 27). Specifically, Plaintiff testified:

> After I received my letter for termination, . . . I called the union and they said they were going to set up another hearing. So when I went to the union, I think his name was Dietrich [sic] in Pittsburgh, had told him that I was terminated, that [there] was[] no need for another hearing. So they told – the union advised me, they said what you – I would still be considered employed for I think six months where I won't be able to get my – where I could still have insurance, but at the time I needed money to pay my bills. . . . After I talked to my union rep, they talked to Dietrich [sic] and he said I was terminated and then, yes, [I sent in a letter of resignation].

(*Id.* at 23).

After his termination, Plaintiff began employment with U.S. Pipe. (*Id.* at 44). However, Plaintiff only worked there from October 12, 2015 to October 29, 2015. He left employment because he did not feel safe working there. (*Id.* at 44-49). After U.S. Pipe, Plaintiff sought other employment, but he was unsuccessful. It was not until April 2016 that he began working as a production team member with North America On-Site. (*Id.* at 51-54).

### D. Plaintiff's Comparator Evidence—Ray Stanford

In his Complaint and opposition brief, Plaintiff principally relies on "comparator evidence" to put forth a *prima facie* case of race discrimination. Plaintiff proposes one comparator: Ray Stanford, a Caucasian male who was employed as a crane operator.

Stanford began working with Defendant in August 1985 at the Birmingham Southern Railroad facility and remained employed until January 31, 2012, when he went to work for a company called CDL Electric. (Doc. # 24-10 at 8, 10-11). He returned to work at Defendant's Fairfield Works Pipe Mill around April 2012. (*Id.* at 8). Stanford was a crane operator, and he

---

[12] Plaintiff testified that he spoke with his Union representative, Martin Edwards, and a Union member, David Clark, regarding his options after his discharge, but that he was never informed by either one of them that he could file a further grievance or request arbitration. (Doc. # 24-5 at 32).

testified that he received training from Junior Land who showed him the "operation of the crane and [rode] with [him] every day. . . . [Land would go] over the safety and things of the crane and stuff to the best of his knowledge to teach [Stanford] how to operate the crane." (*Id.* at 20).

Stanford had only been working as a crane operator for approximately four weeks. (Doc. # 24-1 at 149). He was scheduled to work the shift after Plaintiff and to replace him on the crane on August 29, 2015. (Doc. # 24-10 at 21). Stanford testified that he saw Plaintiff get off the crane and that Plaintiff came over and told him the crane was broken. (*Id.* at 21-22). Stanford then called his supervisors, Gibson and Meyers, who told Stanford to wait and not board the crane yet. (*Id.* at 22). Stanford testified that when maintenance got there, he was told to "board the crane, that there was a maintenance man coming down the other side of the crane on the building and he was going to board over there, get onto the crane, and [Gibson and Meyers were] going to get it lined up to push [it] to the bumper to the end of the building." (*Id.* at 24-25). Stanford further testified that Gibson and Meyers told him that the hot rail was "locked out" (that is, it was deenergized), and it was safe for him to board. (*Id.* at 25). Gibson and Meyers then told Kamau, another crane operator, to board a different crane that would be used to push the broken crane. (*Id.* at 26). Stanford testified that when it was initially pushed, the crane moved with little effort, but then started moving too quickly, and because its brakes were not working, it slammed into a steel bumper. (*Id.* at 28-30). Stanford was injured in the crash and required medical attention. (*Id.* at 31). He was not wearing fall protection (*see id.*), but he insists that Gibson and Meyers assured him that the crane was locked out. (*Id.* at 31, 33).

Upon leaving the hospital, Stanford went back to the facility to recount the events that had occurred. (*Id.* at 40-41). Stanford testified that he informed his supervisors of what happened and returned to work the next day. (*Id.* at 44).

Stanford also had a 9B fact-finding hearing. At the conclusion of the hearing, Defendant (specifically Dittrich and Bauer with Labor Relations) decided not to discharge him for two reasons: (1) "in contrast to [Plaintiff] who was directed to remain in the [crane] cab by [Gibson] and defied that direction,[13] Stanford was directed by [Gibson and Meyers] to board the crane without first providing Stanford proper safety precautions on accessing and then boarding;" and (2) "Stanford had 30 years of Company service with no discipline on his record when the incident occurred." (Doc. # 27-1 at 3; Doc. # 24-1 at 163). Instead, Stanford's discipline was converted to a ten-day suspension. (Doc. # 24-1 at 273). Stanford remains employed by Defendant, working as an in-process storage crane operator. (Doc. # 24-1 at 201, 260).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

---

[13] As stated above, this assertion is disputed and is not found anywhere in the Rule 56 record -- including the Root Cause Analysis, which is a "very detailed assessment of the facts" -- apart from the deposition testimony of two individuals who had only second-hand knowledge. The only mention of Plaintiff being told to stay in the crane is found in Dittrich's testimony and Thomas' testimony. Dittrich recalls being told by Moses that Gibson ordered Plaintiff to remain in the crane cab. (Doc. # 24-7 at 68-73). Additionally, Moses testified that in a "Job/Safety Flash" that was distributed to U.S. Steel after the August 29, 2019 incident (which was made after the investigation was concluded), he (Moses) could not find any indication that Gibson or Myers told Plaintiff to stay with the crane. (Doc. # 24-1 at 151-52).

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

The court reviews the Rule 56 record and analyzes Plaintiff's claims under the appropriate legal frameworks. After careful review, and for the reasons stated below, the court concludes that Defendant's Motion for Summary Judgment is due to be denied.

### A.  Plaintiff's Title VII Discriminatory Termination Claim

Historically, Title VII discrimination claims that rely on circumstantial evidence have been evaluated under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) ("A plaintiff typically makes a case of discrimination through indirect evidence using the burden-shifting framework set out in *McDonnell Douglas* . . . ."). Of course, there are other methods which can be used in a Title VII case to show that an issue of fact exists on summary judgment. Therefore, the court begins its analysis of Plaintiff's Title VII / § 1981 race discrimination claim under the well-established *McDonnell Douglas* framework. It will then also analyze whether there is other circumstantial evidence of discrimination presented here.

Under the *McDonnel Douglas* framework, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). Once a plaintiff has presented a *prima facie* case and raised the presumption of discrimination, the burden of *production* shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). This burden involves no credibility determination, *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); *Brown v. Ala. Dep't Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) ("The employer 'need not persuade the court that it was actually motivated by the proffered reasons.'" (quoting *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981))).

If the employer satisfies that burden by articulating one or more such nondiscriminatory reasons, the presumption of discrimination is dispersed, and the burden again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. *Perryman*, 698 F.2d at 1142. If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it "head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

### 1. Plaintiff's *McDonnell Douglas* Prima Facie Evidence

A Title VII plaintiff claiming that he suffered a discriminatory discharge generally must show the following to establish a *prima facie* case: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Here, Defendant contests whether Plaintiff can meet the third and fourth prongs of the *prima facie* test. (Doc. # 23 at 17-18). Thus, Plaintiff's *prima facie* case rests on whether he suffered an adverse employment action and whether he has an appropriate comparator. *See Maynard*, 342 F.3d at 1289. The court addresses those elements in that order.

#### a. Plaintiff Suffered an Adverse Employment Action

"Under the third element of the *prima facie* case, for conduct to qualify as an adverse employment action, the conduct must, in some substantial way, alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [ ] his or her status as an employee." *Powell v. Nat'l Labor Relations Bd.*, 2019 WL 4572915, at *4 (N.D. Ala. Sept. 20, 2019) (quoting *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)) (internal quotation marks omitted). "To determine whether an employment action is 'adverse,' courts use an objective test: whether a reasonable person in the plaintiff's position would consider the employment action materially adverse." *James v. City of Montgomery*, 2019 WL 3346530, at *7 (M.D. Ala. July 25, 2019). As the Eleventh Circuit has acknowledged, "[e]very qualified minority employee who gets fired . . . necessarily satisfies the first three prongs of the traditional *prima facie* case." *Lewis v. City of*

*Union City, Ga.*, 918 F.3d 1213, 1223 (11th Cir. 2019) (en banc).

Here, Plaintiff was formally discharged after the 9B hearing on October 20, 2015. (Doc. #24-5 at 151). Although Plaintiff "resigned" so he could withdraw funds from his 401(k) plan, a reasonable person in Plaintiff's position could consider this discharge an adverse employment action.[14] To be sure, there is Rule 56 evidence that Defendant understood Plaintiff was "terminated" (rather than resigned). (*See e.g.*, Doc. # 24-2 at 40).

Therefore, Plaintiff has satisfied the third prong.

### b. Plaintiff Has Identified an Appropriate Comparator

Under *McDonnell Douglas*, an employee identified as a comparator by a Title VII plaintiff must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226. The Eleventh Circuit has clarified how one can meet this standard: A plaintiff must establish that the comparator (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the same employment policy, guidelines, or rule as the plaintiff;" (3) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28. "A valid comparison will turn not on formal labels, but rather on substantive likenesses. . . . [A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1355 (2015)). To summarize, "the plaintiff and her

---

[14] Defendant, however, contends the undisputed Rule 56 evidence shows that Plaintiff resigned as of August 29, 2015. (Doc. # 24-5 at 33). That argument is without merit. First, the Rule 56 record contains evidence that Plaintiff did not file any further grievances after he received notice of his discharge because he believed, from communications with the Union, he had exhausted all of his options. (Doc. # 24-5 at 32). Second, there is summary judgment evidence that Plaintiff only chose to submit a letter of resignation because, after he was discharged, he was told by his Union representatives that if he "resigned," he could recover the money from his 401(k) plan. (*Id.* at 151). There is no serious allegation (much less evidence) in this case indicating that if Plaintiff had not been told he was discharged he would have nevertheless resigned.

comparators need *not* be similar in all but the protected ways." *Young*, 135 S. Ct. 1354 (emphasis omitted). Indeed, "[w]hether a comparator is similar in 'all material respects' is determined on a case-by-case basis, considering the individual circumstances in each case." *Lewis*, 918 F.3d at 1224.

Although Plaintiff and Stanford do not share the same employment history,[15] Stanford is similarly situated in all material respects to Plaintiff. First, Stanford engaged in the same misconduct as Plaintiff—*i.e.*, he violated the same two Cardinal Rules as Plaintiff. Second, Plaintiff and Stanford were both "box two" crane operators; therefore, they were subject to the same policies, guidelines, and rules; particularly, Cardinal Rules. Third, Stanford was under the jurisdiction of the same supervisor as Plaintiff. Gibson was the supervising manager during Plaintiff's shift and part of Stanford's shift. Gibson was also the supervisor who Plaintiff called when the crane broke and who, in part, told Stanford to board the broken crane. Fourth, Plaintiff and Stanford received the same discipline (two five-day suspensions subject to discipline) from the same decisionmakers; specifically, Dittrich and Bauer.

The Rule 56 evidence demonstrates that Plaintiff and Stanford were involved in "sufficiently similar," if not nearly identical, misconduct. *Killingsworth v. Birmingham-Jefferson Cty. Transit Auth.*, 2091 WL 3892340, at *7 (N.D. Ala. Aug. 19, 2019) (quoting *Lewis*, 919 F.3d at 1228). Defendant attempts to argue that Stanford's violations were materially different because he was directed to board a crane by his supervisor without the necessary safety equipment (whereas Plaintiff deliberately disobeyed an order to stay in the crane). However, this

---

[15] Importantly, the Rule 56 record reflects that Stanford, who had been with different subsidiaries of Defendant for approximately thirty years, did not have any prior disciplinary history. (Doc. # 27-1 at 3). Plaintiff, however, had five prior disciplinary actions taken against him during the course of his 17 years and 7 months with Defendant's subsidiary, Field Works. (Doc. # 24-1 at 222). Examining the Rule 56 record as a whole and viewing the facts in the light most favorable to the nonmoving party, this difference, by itself, does not automatically remove Stanford as a proper comparator for summary judgment purposes, but it is a factor.

is a jury argument. Other than the two second-hand accounts mentioned above, there is no Rule 56 evidence that makes it undisputed that Plaintiff deliberately disobeyed his supervisor's command. Because this distinction, along with Stanford's lengthy tenure with Defendant, serves as a primary basis for Defendant's decision to discharge Plaintiff and not Stanford, it is crucial for a jury to determine whether Gibson, in fact, ordered Plaintiff to stay in the crane. This is not for the court to decide. Whether Gibson ordered Plaintiff to stay in the crane is a question of fact properly reserved for resolution by a jury.

Therefore, Plaintiff has presented a *prima facie* case of race discrimination because there is a genuine issue of material fact regarding Plaintiff's discharge and the reasoning behind Defendant's decision. The analysis now turns to whether Defendant can proffer a nondiscriminatory reason for discharging plaintiff. If it can, then Plaintiff once again has the burden of showing that the proffered nondiscriminatory reason for discharging him is a pretext for race discrimination.

### 2. Defendant's Nondiscriminatory Reasons for Discharging Plaintiff

Once a plaintiff makes out a *prima facie* case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 253). The burden at this stage "is exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). It is merely a burden of production, not a burden of proof. *Id.*

Here, Defendant has easily discharged its burden, as it says it terminated Plaintiff because he violated two Cardinal Rules: failure to wear fall protection and failure to lock out/tag-out the crane. (Doc. # 24-7 at 22). It is uncontested that an employee who violates a Cardinal Rule can be discharged. (*Id.* at 46-47). Therefore, Defendant has met its burden of articulating a

legitimate, nondiscriminatory reason for discharging Plaintiff, and the court is not in the position to question Defendant's reasoning. *Flowers v. Troup Cty, Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. We are not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010))).

### 3. Plaintiff's *McDonnell Douglas* Pretext Arguments

Because Defendant has met its burden of production, the burden shifts back to Plaintiff to show that Defendant's proffered reason is pretext for unlawful discrimination.[16] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). "A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Husk v. City of Talladega, Ala.*, 2019 WL 2578075, at *4 (N.D. Ala. June 24, 2019) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Where the defendant offers the plaintiff's violation of a work rule as its reason for discharging the plaintiff, "the reason 'is arguably pretextual when a plaintiff submits evidence (1) that [he] did not violate the cited work rule, or (2) that if [he] did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated.'" *Landry v. Lincare, Inc.*, 579 F. App'x 734, 738 (11th Cir. 2014) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)).

After careful review, the court concludes there is a genuine issue of material fact regarding why Defendant discharged Plaintiff and not Stanford for violating the same two

---

[16] "Evidence introduced to establish the *prima facie* case may be considered to establish pretext." *Menefee v. Sanders Lead Co.*, -- F. App'x --, 2019 WL 4466857, at *3 (11th Cir. Sept. 18, 2019) (citing *Hairston v. Gainesville Sub Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993)).

Cardinal Rules. That question is for a jury to decide at trial, not the court on this Motion.

First, Defendant's decision to discharge Plaintiff rests heavily on the fact that Defendant contends Gibson told Plaintiff to remain in the crane. Defendant asserts that Dittrich held an honest belief that Gibson told Plaintiff to stay in the crane. But, the evidence Defendant relies upon is in dispute, as discussed above, and does not foreclose Plaintiff's pretext argument. Again, the Rule 56 evidence indicates that Gibson told Plaintiff to stay in the crane, and this is based on second-hand accounts, all of which originates with one employee—Moses. Even more significantly, Plaintiff testified that Gibson did not tell him to stay in the crane (*see* Doc. # 34-5 at 105, 160), and Gibson signed a statement on June 21, 2016 stating that he does "not recall telling [Plaintiff] not to leave the crane." (Doc. # 24-6, Def. Ex. F, at 29).[17] This dispute is a quintessential question of fact properly reserved for resolution by a jury. So while "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct," *see Landry*, 579 F. App'x at 738 (quoting *Damon*, 196 F.3d at 1363 n.3), the jury must decide if that is what occurred; *i.e.*, that Defendant held a good-faith belief as opposed to constructing a false narrative to mask a discriminatory motive.

Second, there is question about the level of training Plaintiff received before being cleared to operate the crane. Dittrich testified that he discharged Plaintiff because there were no evidentiary issues with his case. (Doc. # 24-7 at 47). However, the Rule 56 record suggests that Plaintiff and Stanford received different methods (and amounts) of training.

In his EEOC Charge, Plaintiff stated that he only received two weeks of training on the crane before the August 29, 2015 incident, and Defendant's records indicate the same. (Doc. #

---

[17] Gibson also testified that he does not recall telling Plaintiff to stay in the crane, nor has he seen any documents showing that he told Plaintiff to stay in the crane. (Doc. # 24-8 at 53).

24-3 at 156; Doc. # 24-1 at 149, 219). Stanford, however, testified that he received individualized training from Junior Land from the time he started working as a crane operator. (Doc. # 24-10 at 20). Plaintiff testified that he did not receive any training on the specifics of crane operation or the governing procedures before getting in the crane on August 29, 2015. (Doc. # 24-5 at 83). Notably, in May 2015, Plaintiff missed a training on overhead crane safety because he was on vacation, and he stated that he never made up this training. (*Id.* at 97-98). And, in an email chain among employees of Defendant, it is noted that on July 28, 2015, Plaintiff was due or past due to attend a crane refresher class. (Doc. # 24-2 at 56). Thus, while Plaintiff began crane operations training during the week of August 16, 2015 (*see* Doc. # 24-2 at 20 and Doc. # 24-1 at 149) and received training from either Letisa Parker, Keith Higgins, or Junior Land (*see* Doc. # 24-1 at 219), whether Plaintiff received sufficient training to be made aware of the updated protocol for operating a crane is, again, a question for a jury.

Finally, Defendant cites to Plaintiff's disciplinary history and Stanford's lack of disciplinary history as one reason for Plaintiff's discharge. While the Rule 56 record reflects that Plaintiff received five written disciplines between 2000 and 2014, it is not apparent from the record whether any of these disciplines were issued while Plaintiff was working as a crane operator. It is also notable that Plaintiff's disciplinary history spans 14 years, so there is a question as to whether the discipline received in 2000 and 2010 are too remote in time from the August 29, 2015 incident. Also, because Stanford worked for other subsidiaries during a significant span of this work, the record does not reflect whether he received other discipline at those other entities.

### 4. Other Circumstantial Evidence of Discrimination

Although it is often useful, the *McDonnell Douglas* framework "is not the exclusive

means" of prevailing on a Title VII claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005). A plaintiff's claim will also survive summary judgment if he presents "enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Thus, even if the court found that Stanford was not an appropriate comparator, it would still be called upon to thoroughly examine all of the circumstantial evidence presented in this case to see if a reasonable inference of discrimination has been raised. In addition to the comparator evidence discussed above, the following record evidence is relevant to that analysis.

First, in a crane operation evaluation form dated August 2, 2015 (just before the incident at issue here), Plaintiff received a "good" (the second highest) rating for all "operations" tasks. (Doc. # 24-6 at 4).

Second, Moses testified that Stanford should have known not to go up on the crane without proper fall protection. Specifically, Moses stated:

> [A]t any point, no matter whom it's the fault of, [an employee should] refer back to that stop sign [with the rules on it], right, and at any point Ray Stanford could have said [to Gibson and Meyers], you're telling me to go up on this crane, hold up a second, it's not locked out. I don't have – let me get my fall protection first, let's make sure it's locked out. Let's do what we need to do to get up on that crane safely. That didn't happen. So the shift manager said hey, you go up there. Ray [Stanford], you know, . . . he has the right to stop if he feels like he has been told to do something unsafe.

(Doc. # 24-1 at 180-81). From this perspective, a reasonable juror could question the veracity of Defendant's contention that Stanford is not a proper comparator because Stanford was directed to go up on the crane without fall protection and would have been insubordinate if he did not comply. It is clear from the Rule 56 record that Stanford was still required to wear fall protection -- and knew he should have -- but did not do so. (*Id.* at 182).

Third, the Rule 56 evidence shows that on July 28, 2015, Plaintiff was due or past due to attend a crane refresher class. (Doc. # 24-2 at 56). This is approximately one month before the incident that led to Plaintiff's discharge. Additionally, Plaintiff was scheduled to attend a crane-operation refresher class the week before the August 29, 2015 incident. (Doc. # 24-1 at 208). However, Plaintiff did not attend the class. (*Id.* at 209). The Rule 56 evidence reflects that there were gaps in Plaintiff's training, because Plaintiff understood the procedures he learned during his prior training in 2001 to govern his conduct in 2015.

Fourth, after Plaintiff was discharged, Defendant had to fill Plaintiff's prior position on three separate occasions, and each time the employee chosen was Caucasian. (Doc. # 24-3 at 156-57).

Fifth, Defendant argues that race could not have been taken into consideration in Defendant's discharge of Plaintiff because Dittrich testified that he did not know Plaintiff's race at the time of his discharge. However, as correctly pointed out by Plaintiff and conceded by Defendant, Dittrich was not the only decisionmaker who was involved in making the decision to discharge Plaintiff; Bauer, Moses, and Mullarkey were also involved. Doc. # 24-2 at 100). And, Dittrich had access to Plaintiff's biographical data when he made the decision to discharge Plaintiff. (Doc. # 24-7 at 50). Whether others were motivated by Plaintiff's race, and whether Dittrich actually reviewed the data are questions of credibility for a jury to answer.

Although the court concludes that Stanford is a proper comparator, thus allowing Plaintiff's claim to proceed under *McDonnell Douglas*, it also concludes (alternatively) there is sufficient Rule 56 evidence to raise an inference of discrimination under a mosaic theory. As the Eleventh Circuit has explained, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary

judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328. Rather, a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

Here, viewed in the light most favorable to the plaintiff, there is sufficient Rule 56 evidence that Plaintiff's race was considered in his discharge. That is, a jury could find "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)).

For these reasons, Defendant's Motion for Summary Judgment on Plaintiff's race discrimination claim is due to be denied.

### 5. Plaintiff Can Show that Racial Animus Was a Motivating Factor in Defendant's Decision to Discharge Him from Employment

Finally, in some cases, a plaintiff can survive a motion for summary judgment under a mixed-motive framework, wherein "the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision.'" *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)). This framework does "not call for the unnecessary burden-shifting required by *McDonnell Douglas*, nor does it suffer from *McDonnell Douglas*'s pitfall of demanding that employees prove pretext." *Id.* at 1240. The court concludes this is one of those cases.

Plaintiff has presented sufficient Rule 56 evidence for a reasonable jury to conclude that Plaintiff's race was a motivating factor in Defendant's decision to discharge him. Plaintiff and

Stanford are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226. They violated the same Cardinal Rules during the same incident; they both have a long history of employment with Defendant; they both worked as crane operators; and they both worked under the same supervision. And while a jury could conclude they had different culpability and different disciplinary records, and that is what made the difference here, the same jury could conclude that was not the reason for their different treatment but the main difference is that Plaintiff is African-American and Stanford is Caucasian.

In light of all the Rule 56 evidence discussed above, a reasonable jury could infer that race was a motivating factor in Defendant's decision to discharge Plaintiff.

Overall, the court recognizes that the Rule 56 record is significantly muddied from a lack of relevant factual information as to many questions surrounding the tenures of Plaintiff and Stanford while at U.S. Steel. In addition to the issues referenced above, there are questions as to what Plaintiff's position was between 2002 and 2015, whether the subsequent incident Plaintiff was involved in soon after the August 29, 2015 incident was taken into account during the 9B hearing, and what factors were considered when upper-level management decided not to discharge others involved in this incident, including McClendon, notwithstanding his violation of a Cardinal Rule. Therefore, in light of Rule 56, the court concludes that there are questions that a jury must resolve.

## IV.    Conclusion

For the reasons explained above, Defendant's Motion for Summary Judgment (*see* Doc. # 22) is due to be denied. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this December 13, 2019.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE